[No. 43668.   En Banc.   January 5, 1979.]

EUGENE B. CLAWSON, *Respondent,* v. LONGVIEW PUBLISHING COMPANY, ET AL, *Appellants.*

*Klingberg, Houston, Reitsch, Frey & Kenny,* by *Judson T. Klingberg* and *Gerry A. Reitsch,* for appellants.

*Roethler & McCulloch,* by *Wayne Roethler* and *Don L. McCulloch* and *Taylor & Ulin,* by *Philip E. Hickey,* for respondent.

UTTER, J.—This is an appeal from a $10,000 judgment rendered in a defamation action against appellant publishing company and the managing editor of the Longview Daily News, Ted M. Natt. Appellants allege numerous substantive and evidentiary errors in conduct of the trial below. Finding the appeal to be meritorious, we reverse the judgment against the appellants and return this case to the Superior Court for further proceedings consistent with our determination.

This controversy arose out of a comprehensive investigation into the activities and practices of Charles Gill, Sheriff of Cowlitz County. That investigation resulted in the publication of articles in The Daily News focusing on the sheriff's conduct in office. One incident described in the articles involved the respondent, Eugene (Bert) Clawson, who was Administrator of the Cowlitz County Motor Pool. It was reported that respondent had towed a disabled automobile belonging to the sheriff's son to the county garage. The article containing that report, appearing in the April 23, 1973, edition of the newspaper, went on to state:

> Once in the shop, the sheriff purchased a new engine block. But Clawson purchased a variety of small parts— from a water pump to spark plugs—for the Gill Boy's car at county expense. The total cost of parts was just over $41.

The new block and engine parts were installed on county time. The son's car was reportedly in the garage for several weeks and caused at least one county employee to complain about it. There was an oral policy in effect at the time that private cars not be worked on.

Respondent then commenced this defamation action. The next week the newspaper published a letter of response from the sheriff claiming not to have "done anything wrong." The paper included an editor's note stating that the article was published after a "thorough investigation", and that it was "fair, accurate and factual."

Respondent was Administrator of the Cowlitz County Motor Pool for nearly 10 years until his dismissal in October 1972 for involvement in the incident which is the subject of this defamation action. The function of the motor pool was to maintain and repair county vehicles. Respondent supervised a staff consisting of one full–time assistant and other part–time employees. He operated the motor pool without direct supervision and without specific written or oral instructions. He had arrangements with local distributors to supply the motor pool with a constant inventory of gas, oil, spark plugs, and other small parts and he had authority to bind the county financially for such items. Further, he had independent financial authority—up to $500 per purchase—to spend county funds in the procurement of parts and supplies through open accounts maintained at numerous establishments. Simultaneously, respondent operated his own private towing and garage business. He kept his tow truck at the county motor pool facility and maintained private accounts at many of the same automotive establishments at which the county had an open account.

After respondent's dismissal, the prosecuting attorney began an investigation. He found what he concluded to be irregularities in the purchases of the county motor pool, irregularities which he concluded clearly demonstrated criminal conduct by respondent. An assistant prosecuting

attorney, C. C. Bridgewater, Jr., interviewed respondent's full–time assistant at the motor pool, Steven Carr, who confirmed that spark plugs, wires, oil, and an oil filter purchased by the county were installed in the car belonging to the sheriff's son. The assistant prosecutor recorded his interview and placed the transcribed version of it into a file after examining it for accuracy. He also placed several invoices from the motor pool purchases into that file. Eventually a hearing was held before a special inquiry judge but no charges were filed because, according to the prosecutor's testimony, he believed that respondent's dismissal was sufficient punishment for his transgressions.

Early in 1973 appellants began their investigation into the activities of the sheriff after becoming aware of deputy complaints. Two reporters, in addition to the managing editor, worked on the investigation. They contacted sheriff's deputies and the sheriff. They also consulted with the prosecuting attorney, who verified, in their entirety, the facts later appearing in the newspaper story. The sheriff was offered an opportunity to read the story before publication. Appellant Natt met again with the prosecuting attorney just prior to publication to reconfirm the accuracy of the story. However, respondent was not consulted prior to publication. Appellant Natt testified that respondent was not contacted because he was not the primary focus of the article, because appellants were satisfied with the prosecuting attorney's reliability, and because they were aware that respondent had appeared before the special inquiry judge and was under court compulsion to refrain from discussion of the incident.

Conflicting testimony was presented regarding the accuracy of the newspaper story. The trial judge ruled, as a matter of law, that respondent was not a public official under constitutional definitions of that term, and submitted the case to a jury on a negligence standard. The jury returned the $10,000 verdict.

Appellants assign error to the trial judge's determination that, as a matter of law, respondent was not a public official. Appellants urge that respondent was a public official as a matter of law. We agree.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), the United States Supreme Court recognized the necessity to balance the interest of individuals in protecting their reputations against the necessity to insure the continued free exchange of ideas mandated by the First Amendment. Finding the strict liability imposed by the common law created a potential for self–censorship of the press which "dampens the vigor and limits the variety of public debate" (*New York Times* at 279), the court held liability could not be imposed for statements defaming a public official concerning his official conduct absent a showing of actual malice on the part of the publisher.[1] The *New York Times* holding was later extended to require proof of actual malice in cases involving defamation of a "public figure", *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967), and made its furthest extension in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971). There a plurality decision focused not upon the status of the individual defamed, but rather upon the issues with which the publication was concerned, and held even a private individual could not recover for a defamatory falsehood, published in the course of comment upon an event of public or general concern, without proving actual malice. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), the

---

[1]The court defined actual malice as making a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). The "actual malice" standard has undergone subsequent refinements. *See Garrison v. Louisiana,* 379 U.S. 64, 78–79, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964); *St. Amant v. Thompson,* 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968); *Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler,* 398 U.S. 6, 12–14, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970); *Time, Inc. v. Pape,* 401 U.S. 279, 290, 28 L. Ed. 2d 45, 91 S. Ct. 633 (1971).

Supreme Court retreated from the position established in *Rosenbloom,* abandoning its focus upon the nature of the ·event reported and accenting instead the status of the individual defamed. *Gertz* holds the malice standard enunciated in *Rosenbloom* need no longer be applied to defamatory falsehoods uttered by a publisher or broadcaster concerning a private individual and a matter of general public ·interest, and that

> so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.

*Gertz v. Robert Welch, Inc., supra* at 347. The *Gertz* decision, while altering the standard of liability applicable to private individuals, expressly recognizes the continuing vitality of both the "public official" and "public figure" doctrines and the necessity of proof of malice as to these classes of persons. *See Gertz v. Robert Welch, Inc., supra* at 342–43.

It is conceded by all concerned that the newspaper article here at issue involves a matter of general public concern within that publication's area of circulation. It is also clear that the record is devoid of evidence suggesting the statements concerning the respondent were published with "actual malice" as that term has been defined by *New York Times* and its progeny. The determination of the "status" of the respondent is thus crucial to the existence of liability on the part of the appellants. If the respondent is a private individual, he need only show negligent publication. On the other hand, if he is a public official, liability may not be imposed, for no malice has been shown.

■ It is a task for the court to determine, in the first instance, whether the proofs show respondent to be a public official. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966). Here the trial court erred in holding the respondent to be a private individual as a matter of law and this error requires reversal of the judgment. In defining the term "public official", the courts must use

constitutional, *not* state law or dictionary standards. In *Rosenblatt,* the court states at page 84:

> Turning, then, to the question whether respondent was a "public official" within *New York Times,* we reject at the outset his suggestion that it should be answered by reference to state–law standards. States have developed definitions of "public official" for local administrative purposes, not the purposes of a national constitutional protection. If existing state–law standards reflect the purposes of *New York Times,* this is at best accidental. Our decision in *New York Times,* moreover, draws its force from the constitutional protections afforded free expression. The standards that set the scope of its principles cannot therefore be such that "the constitutional limits of free expression in the Nation would vary with state lines." *Pennekamp v. Florida,* 328 U.S. 331, 335.

(Footnotes omitted.)

The court in *Gertz* identified two factors distinguishing the public defamation plaintiffs from private. They are (1) access to the press, and (2) the assumption of the risk of greater public scrutiny attendant to public life. The court recognized the insubstantiality of the access to the press factor, and therefore placed primary emphasis upon the assumption of risk factor.

The theory behind reliance upon the access to press rationale is sufficiently flawed to justify the court's reluctance to accord it significant weight. The assumption that access to media is a remedy for harm to reputation rests on the assumption that the harmed victim will have access and that, if available, it will be adequate to undo the harm to reputation. This access to the press must be based upon purely personal power because no government enforced right to access exists for those whose character has been attacked. Such a government enforced right of access has been held to be violative of the First Amendment. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 41 L. Ed. 2d 730, 94 S. Ct. 2831 (1974).

There are many factors which make access to the press an extremely unpredictable event. One of these is lack of

competition among the media, seriously limiting a victim's opportunity for rebuttal. Another is the media's interest in protecting its credibility. Still another is the lack of impact of rebuttal even if published, unless it reaches the same audience as the defamation reaches, is published quickly, and given equal prominence. News changes quickly and the scandal is usually more newsworthy and interesting to the public than the rebuttal. *See* Note, *An Analysis of the Distinction Between Public Figures and Private Defamation Plaintiffs Applied to Relatives of Public Persons,* 49 S. Cal. L. Rev. 1131 (1976).

The *Gertz* majority recognized the weakness of the "rebuttal" rationale:

> Of course, an opportunity for rebuttal seldom suffices to undo harm of defamatory falsehood. Indeed, the law of defamation is rooted in our experience that the truth rarely catches up with a lie. But the fact that the self-help remedy of rebuttal, standing alone, is inadequate to its task does not mean that it is irrelevant to our inquiry.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344 n.9, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). Self–help, as the dissent also pointed out, is "'too insubstantial a reed on which to rest a constitutional distinction.'" *Gertz* at 363–64 (Brennan, J., dissenting).

Due to the weakness apparent in the rebuttal theory, the majority in *Gertz* placed its primary reliance on the theory that private citizens, unlike public officials, do not assume the risk of public scrutiny:

> More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official

duties. . . . . [T]he public's interest extends to "anything which might touch on an official's fitness for office.

*Gertz v. Robert Welch, Inc., supra* at 344–45.

While this broad rationale may apply to those who seek elected public office, it also furnishes the basis for liability of nonelected but nevertheless "public" employees. Public employees are involved in the business of the public and cannot expect the same degree of protection of their privacy as it relates to their work as those employed in the nonpublic sector. They do not place their personal lives before the public to the extent elected officials must under the rationale in *Gertz,* but, even relatively low level public employees must, nonetheless, expect a degree of public interest in the performance of their duties. This is especially true where, as here, the employees exercise unsupervised discretion in the expenditure of public funds.

The nature of the respondent's duties and responsibilities as a government employee, particularly when coupled with the potential conflicts created by his private business activities, renders him a "public official" for purposes of the *New York Times* rule. That term applies

at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

. . . Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees . . . the *New York Times* malice standards apply.[13]

[13] . . . The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.

*Rosenblatt v. Baer, supra* at 85–87.

The "actual malice" standard is applicable to any aspect of a public official's life which might touch on an official's

fitness for his position. *See Garrison v. Louisiana,* 379 U.S. 64, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964). With officials wielding general power and exercising broad discretion, the scope of that standard is necessarily comprehensive, encompassing virtually all of the public official's life. *See Garrison v. Louisiana, supra; Monitor Patriot Co. v. Roy,* 401 U.S. 265, 28 L. Ed. 2d 35, 91 S. Ct. 621 (1971); *Ocala Star–Banner Co. v. Damron,* 401 U.S. 295, 28 L. Ed. 2d 57, 91 S. Ct. 628 (1971). However, with persons such as respondent, the "public official" standard fails to sweep so broadly; exposure is limited to matters more closely connected to actual job performance. In essence, we find two pertinent variables: (1) the importance of the position held, and (2) the nexus between that position and the allegedly defamatory information—specifically, how closely the defamatory material bears upon fitness for office. In comparison with other public positions carrying with them independent authority and discretion, respondent's former position is near the bottom of those that could arguably be considered "public official" positions in the First Amendment sense. However, the nexus between respondent's position and the defamatory allegations could not be closer, as they related directly to respondent's job performance. This latter fact bears heavily upon the "public official" determination in this case.

Respondent's unsupervised power to expend public funds, coupled with his maintenance of private accounts at many of the same establishments at which he made county purchases, reveals the potential for abuse. The record indicates that the respondent did in fact succumb to this temptation on a number of occasions.[2] The fact that this potential for abuse exists presents a matter of interest to

---

[2]While the evidence presented at trial was contradictory as to the truth of some of the specific assertions contained in the newspaper article at issue, there is substantial and essentially unrefuted evidence in the record indicating the respondent abused his position of authority and trust by such acts as working on private vehicles in the county garage and charging storage for private vehicles left in the county garage and then failing to account to the county for that revenue.

the public, quite apart from the specific allegations of misconduct contained in the newspaper article forming the basis for this action. The public quite naturally has a legitimate and continuing interest in how local tax revenues are spent by those county employees vested with power to utilize the public purse.

The substantial body of law which has developed since *New York Times* is consistent with our determination here. The *New York Times* rule clearly applies to appointed as well as elected officials. *See Time, Inc. v. Pape,* 401 U.S. 279, 290, 28 L. Ed. 2d 45, 91 S. Ct. 633 (1971). This court has declared a port district commissioner to be a "public official" in this context, *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 515 P.2d 154 (1973), and has indicated under certain circumstances police officers may be as well. *Tilton v. Cowles Publishing Co.,* 76 Wn.2d 707, 459 P.2d 8 (1969). The United States Supreme Court has indicated the doctrine applies to the clerk of a state court, *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 19 L. Ed. 2d 248, 88 S. Ct. 197 (1967). Courts of other jurisdictions have held the term applicable to a school principal, *Reaves v. Foster,* 200 So. 2d 453 (Miss. 1967); *Kapiloff v. Dunn,* 27 Md. App. 514, 343 A.2d 251 (1975); school teachers, *Basarich v. Rodeghero,* 24 Ill. App. 3d 889, 321 N.E.2d 739 (1974); the auditor for a public water works, *Kruteck v. Schimmel,* 27 App. Div. 2d 837, 278 N.Y.S.2d 25 (1967); a justice of the peace and his clerk, *Ross v. News–Journal Co.,* 228 A.2d 531 (Del. 1967); police officers, *Coursey v. Greater Niles Township Publishing Corp.,* 40 Ill. 2d 257, 239 N.E.2d 837 (1968); a city–paid investigator, *Bishop v. Wometco Enterprises, Inc.,* 235 So. 2d 759 (Fla. Ct. App. 1970); a private nursing home licensed by the state, *Doctors Convalescent Center, Inc. v. East Shore Newspapers, Inc.,* 104 Ill. App. 2d 271, 244 N.E.2d 373 (1968); the manager of a community center, *Brown v. Kitterman,* 443 S.W.2d 146 (Mo. 1969); the supervisor of a branch post office, *Silbowitz v. Lepper,* 32 App. Div. 2d 520, 299 N.Y.S.2d 564 (1969); the chief x–ray

technician of a county hospital, *Fopay v. Noveroske,* 31 Ill. App. 3d 182, 334 N.E.2d 79 (1975); a secretary hired by a public works director, *Grzelak v. Calumet Publishing Co.,* 543 F.2d 579 (7th Cir. 1975); a social worker, *Press, Inc. v. Verran,* 569 S.W.2d 435 (Tenn. 1978). *See* Annot., 19 A.L.R.3d 1361 (1968). *Cf. Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809 (Tex. 1976), in which the Texas Supreme Court held a civil engineer employed on a part–time basis by a county was not a "public official," noting he could not authorize expenditure of public funds, had no direct contact with the public, did not supervise other employees, and worked under the direct supervision of others.

Having determined that the respondent is a public official for purposes of the instant suit, we need not reach the remaining issues presented to us for review.

The judgment of the trial court is reversed and the cause is remanded to the court. The plaintiff has not carried its burden of proof under the rule announced here. However, because it is unclear whether the plaintiff was on notice as to his burden in this case prior to presenting testimony, the cause is remanded to the trial court for retrial or other proceedings to be heard under the "actual malice" standard.

STAFFORD, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.

ROSELLINI, J. (dissenting)—There was a time when a defamation was generally avenged by resort to the duel, formal or informal, a recourse which was never favored by society, which offered the civil libel action as a more sober substitute. That men would risk death, as well as inflict it, to preserve their honor indicates something of the intensity of feeling with which a person's good name is regarded. While today the law provides a remedy to a person defamed, that remedy is severely restricted where he is a public official or a public figure.

There is no contention here that the respondent was a public figure. Upon conflicting evidence, the jury in this case found that the appellant negligently published false and libelous charges against him. If the respondent was a public employee and not a public official, the court correctly refused to instruct the jury that recovery could not be had without proof of actual malice in the publication. I cannot agree with the majority that the respondent can properly be termed a public official. I do agree that the question of who is a public official so as to come within the constitutional restriction on defamation actions is one upon which United States Supreme Court rulings are controlling. *See* Restatement (Second) of Torts § 580A, comment *b* (1977).

While the factors which are significant in determining whether an individual is such an official have never been clearly defined by that court, it has said that the designation "public official" applies at least to those governmental employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs, and it has added that the position must be one which would invite public scrutiny of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy. *Rosenblatt v. Baer,* 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966). Restatement (Second) of Torts, *supra.*

The majority opinion recognizes the applicability of these factors and yet gives them slight heed in reaching the conclusion that a jury might find the respondent to be such an official.

I find it impossible to discern the reasoning by which the majority concludes that the respondent may have this status. It concedes that the mere fact that the respondent was involved in a matter of general public concern does not subject him to the *New York Times* burden of proof (actual malice) (*New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964)), thus acknowledging the authority of *Gertz v. Robert Welch, Inc.,*

418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), wherein the United States Supreme Court rejected the plurality opinion in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971). The majority also implicitly concedes that the respondent is not a "public figure," a concession which the appellants themselves make. And it expressly acknowledges that only if the respondent is a public official can he be required to prove actual malice in order to recover.

It further recognizes that the question is for the court and not for the jury to decide. It then proceeds, quite summarily it seems to me, to decide that this garage superintendent was not merely a county employee, but a county official, exercising governmental powers and holding an office which invited public scrutiny. Significantly missing, however, in the majority opinion, is any finding that such scrutiny attached to the office itself, entirely apart from the matter publicized. In point of fact, it is precisely the activities charged in the newspaper article which the majority finds sufficient to elevate the respondent's status from that of employee to that of official. In effect, it holds that a newspaper may convert a public employee into a public official simply by publishing a libelous material about him. It was precisely this notion which was rejected in *Gertz.*

The real import of the majority opinion is that, as a matter of public policy, all public employees should be subject to the "actual malice" standard. This conclusion, in the words of the United States Supreme Court in *Rosenblatt,* "virtually disregard[s] society's interest in protecting reputation." *Rosenblatt v. Baer, supra* at 87 n.13. If this is the course to be taken, and assuming that the people are entitled to know what the law is which governs their lives, I think the majority should state its holding in commonly understood language. Only then can an individual be expected to appreciate the risk involved when he accepts government employment.

It is quite obviously conceded by the majority that the respondent was no "public official," as that designation is

commonly understood. Neither was he such an official within the *Rosenblatt* definition.

While all of the duties and powers which the respondent exercised as a motor pool mechanic and supervisor are cited, we are not told how the operation of a garage can be termed "the conduct of governmental affairs." Governmental affairs are, by definition, those which involve the governing of the people—the making, executing, administering, implementing and enforcement of the laws. The maintenance of a motor pool hardly rises to that dignity. In all of the United States Supreme Court cases applying that doctrine, including *Rosenblatt,* at least one of these governing powers was exercised by the plaintiff. *New York Times Co. v. Sullivan, supra* (police commissioner—enforcement); *Garrison v. Louisiana,* 379 U.S. 64, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964) (prosecuting attorney—enforcement); *Rosenblatt v. Baer, supra* (alleged exercise of administrative and implementing powers); *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 19 L. Ed. 2d 248, 88 S. Ct. 197 (1967) (elected clerk of criminal and civil courts—implementation); *St. Amant v. Thompson,* 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968) (deputy sheriff—enforcement).

The respondent has no duties of equal importance which would invite public scrutiny of the person performing them, apart from the scrutiny and discussion occasioned by the charges in controversy, and the majority is unable to point to any aspect of the respondent's position which would invite such scrutiny.

*Rosenblatt v. Baer, supra,* the one case in which the United States Supreme Court held that a governmental employee might conceivably be found to be a public official, and in which it laid down the criteria upon which the majority and I are agreed, was a suit by the supervisor of a publicly owned and operated recreation area, employed by county commissioners. He claimed to have been libeled by a newspaper article criticizing the management of the area. Since the plaintiff was not named in the article, he found it necessary to allege that his role in the management of the

area was so prominent and important that the public regarded him as "the man responsible for its operations, chargeable with its failures and to be credited with its successes." The court noted that the management of the area was a matter of lively public interest. The case was remanded, apparently for the taking of additional evidence upon the question of the plaintiff's responsibilities and public image, and for a determination by the trial judge "in the first instance" as to whether he was a public official within the meaning of the *New York Times* doctrine.[3]

In that case the public's interest in the management of the recreation area was shown to be continuing and not an interest inspired solely by the charges of mismanagement. Here there was no evidence that the public had any interest in the county motor pool, aside from that which may have been engendered by the published charges.

The majority attaches some significance to the fact that the respondent had a potential conflict of interest by reason of his independent garage operation. This may have affected his performance of his duties, but it was not a characteristic of his position, and, as I read *Rosenblatt,* it is that type of characteristic which determines whether a position is one commanding the attention of the public.

The Supreme Court in *Rosenblatt* was quick to disavow any intention of including all public employees in its concept of public official. It said:

> It is suggested that this test might apply to a night watchman accused of stealing state secrets. But a conclusion that the *New York Times* malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the

---

[3]The court said: "Because the trial here was had before *New York Times* [*Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)], we have concluded that we should not foreclose (the plaintiff) from attempting retrial of his action. We remark only that, as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'" *Rosenblatt v. Baer,* 383 U.S. 75, 87–88, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966).

public's interest; that conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.

*Rosenblatt v. Baer, supra* at 86–87 n.13.

In accord with this disavowal, the court has very recently let stand a plaintiff's verdict in a case where a state court had held that a consulting engineer, hired to prepare specifications for a state contract, need not prove actual malice. *Times–Picayune Publishing Co. v. Forrest,* 435 U.S. 971, 56 L. Ed. 2d 63, 98 S. Ct. 1612 (1978). (*Forrest v. Lynch,* 347 So. 2d 1255, 351 So. 2d 168 (La. App. 1977).)

As the majority shows by a number of citations, other state courts have rendered some rather curious decisions, characterizing as public officials such employees as x–ray technicians, investigators, and office secretaries. Not surprisingly the rationale for these decisions, if any, is not presented in the opinion. The Supreme Court, in spite of its loose definition of the term "public official" in *Rosenblatt,* has expressed some sensitivity with respect to its limits. In *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 271, 28 L. Ed. 2d 35, 91 S. Ct. 621 (1971), the lower court had instructed the jury that a candidate for public office was a public official, and the instruction was not challenged. Nevertheless, the high court said:

[I]t might be preferable to categorize a candidate as a "public figure," if for no other reason than to avoid straining the common meaning of words.

The matter was immaterial there, since the standard of liability was the same in either case.

Insofar as courts of other jurisdictions have departed from the criteria laid down by the United States Supreme Court, I would view them as out of harmony with the public policy of this state which, prior to *New York Times,* favored the right of individuals to recover damages for

careless injury to their reputations occasioned by the publication of false and defamatory statements, even where the statement concerned a public official. *Jolly v. Fossum,* 63 Wn.2d 537, 388 P.2d 139 (1964).[4] Since *New York Times* and its progeny, that policy must be considered to have been modified to the extent which those cases require. Inasmuch as the high court has paid little attention, before *Gertz v. Robert Welch, Inc., supra,* to the interest of the state in protecting reputation, I would be loath to extend the *New York Times* doctrine by judicial action without first giving full consideration to its actual impact on the legitimate col cerns of society, both freedom of speech and press and protection of reputation—an impact which has not been touched upon in this case.

In my opinion, the respondent was not a public official. The Superior Court decided the question properly. The respondent exercises no control over governmental affairs, and his position is one which does not invite public scrutiny, apart from the scrutiny which was aroused when he was accused of misconduct. Under the criteria of *Rosenblatt v. Baer,* 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966), he was a mere employee.

I also believe that public policy and the principles upon which the United States Supreme Court justified its decision in *New York Times* and subsequent cases, dictate that the respondent should be held to the lesser burden of proof required under *Taskett v. KING Broadcasting Co.,* 86

---

[4]*See also* RCW 9.58.020, exhibiting a legislative conclusion that a publisher should be held to a standard of ordinary care with respect to publications concerning public affairs. That criminal statute excused a malicious publication

  when honestly made in belief of its truth and fairness and upon reasonable grounds for such belief, and [when it consisted] of fair comments upon the conduct of any person in respect of public affairs, made after a fair and impartial investigation.

This law expired when the 1976 criminal code (RCW Title 9A) became effective, and the present law does not punish libel. I read this omission as evidencing a legislative finding that civil remedies provided under the common law should be adequate to protect the public interest in reputation. *And see Taskett v. KING Broadcasting Co.,* 86 Wn.2d 439, 546 P.2d 81 (1976).

Wn.2d 439, 546 P.2d 81 (1976), that of showing the absence of ordinary care in ascertaining the facts. It has long been the policy of the courts, in developing the common law, to provide a remedy for those who have suffered harm through the careless conduct of others. They have consistently recognized the interest of the individual in the preservation of his reputation.

I am, of course, acutely aware of the importance of freedom of speech and press and I regard those constitutional rights with the deepest reverence. I am, nevertheless, not blind to the immense power which is wielded by the press and other media and to the helplessness of the individual who is defamed by their utterances. One cannot, after all, fight a duel with a television set, nor will the law permit one to do so with an editor.

I am also aware of the fact that most communications media are conducted as profit–making businesses. In virtually all other fields of human activity, where one conducts his business in such a way as to do harm to others, whether carelessly or intentionally, and sometimes without any fault whatsoever, the law requires him to respond in damages. The exceptions are rare, now that both the state and charitable institutions are answerable for their negligence. These and other very important and essential activities such as the practice of medicine and law, must bear the burden of compensating for the harm which may be negligently inflicted in the pursuit of their very desirable goals. As in other areas, the cost can be spread among those who benefit from the defendant's activity, including its advertisers. The granting of wholesale immunity to the media does not accord with this principle.

I do not mean to say that I believe in the awarding of punitive damages in the ordinary case. Where there has been only negligence, the award should be the same as that for negligence in other areas of human activity—the actual damages suffered. The Supreme Court has announced its approval of this concept in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), although I

must say it appears to have been somewhat inattentive to the question in *Time, Inc. v. Firestone,* 424 U.S. 448, 47 L. Ed. 2d 154, 96 S. Ct. 958 (1976), where a $100,000 verdict for a slightly erroneous reporting of a divorce decree was allowed to stand. As I read the opinions in *New York Times,* the justices there were properly outraged by a verdict of $500,000 awarded to an official who was not named or even obliquely referred to in the advertisement which formed the basis of the action, and whose reputation, in the court's view, was probably enhanced rather than damaged in his own community (the only place where he would be identified with the publication). It seems obvious to me that the verdict there reflected not a finding of damages suffered by the plaintiff but rather a punishment inflicted for disparagement of the community of Montgomery, Alabama, of which the jury were members.

The Supreme Court likened the enormous verdict given by the Alabama jury, and the sustaining of it by the courts of that state, to the punishments imposed for seditious libel under the Alien and Sedition Act of 1798, 1 Stat. 596, which, although it had never been declared unconstitutional by that court, had been successfully declared invalid by the "court of history." That act had punished the publication of

> any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress . . . or the President . . ., with intent to defame . . . or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States . . .

The quite reasonable objection leveled against this type of legislation was that it was an undertaking by the government to punish and therefore stifle criticism of itself. Such a procedure is inimical to the functioning of a free society. Because the jury verdict in *New York Times* was not supported by any evidence of damage to the plaintiff, it could be interpreted as nothing more than a punishment

inflicted on the Times for publishing an ad, which, when read in its entirety, could be understood only as a criticism of the government of Alabama and particularly Montgomery County. While it was not accomplished under a law couched in the language of a sedition act, the result of the sustained verdict accomplished the same purpose.

Unfortunately, the court did not draw the analogy that far, but rather equated the libeling of a public official to the libeling of government itself, thus introducing a new area of constitutional privilege.

Some members of the court spoke of the necessity of granting to the press a degree of immunity which legislative and judicial bodies, as well as high executive officers, enjoy in the performance of their duties—a sort of quid pro quo, it would seem. However, that immunity is quite strictly limited in its scope. *Engelmohr v. Bache,* 66 Wn.2d 103, 401 P.2d 346 (1965); *White v. Nicholls,* 44 U.S. (3 How.) 266, 11 L. Ed. 591 (1845); Restatement (Second) of Torts § 591 (1977). As is pointed out in 50 Am. Jur. 2d *Libel and Slander* § 193 (1970), the immunity is only available where the communication was made on a privileged occasion. *See* Restatement § 591, comment, for differences between immunities of federal and state officers. The court has not seen fit to place a corresponding limitation on the scope of the media privilege. Also, in *New York Times,* it did not consider the question whether an occasion might arise in which a communication by a police commissioner would be absolutely privileged, nor has it paid much attention to this balancing of immunities in subsequent cases. Certainly the "public figure" cases do not involve persons enjoying governmental immunity, and I would be very much surprised if the park superintendent in *Rosenblatt* could claim the privilege to defame others in the pursuit of his duties.

Nevertheless, the Restatement § 580A, comment *a,* gives this corollary as one of the grounds advanced to support the doctrine of *New York Times.* The other grounds of support which it recites are that a public official normally has a greater opportunity than a private citizen to defend

himself, and that by taking the office or position, he voluntarily submits himself to the comments and statements of the public.

The majority here has refuted the notion that a public official or a public figure or anyone libeled by the media has an effective means of defending himself. One would think that, having demolished this justification for the doctrine, the majority would conclude that state courts ought not to extend that doctrine. Instead it opines that the rule should be stretched to preclude recovery by government employees as well as officials and when the employee is charged with having been involved in a publicized matter. One can only conclude that it is the majority belief that if a rule is unjust, it should be made to apply to as many people as possible.

A third leg of the stool of logic which has been constructed to support the *New York Times* doctrine is that a public official assumes the risk of defamation when he embarks upon public life. In other words, he is presumed to be willing to submit to careless defamation and to absorb any damages which he may thereby suffer, as a price which he must pay for serving the public. Since this waiver of common–law rights is not based on any empirical study that I know of, it reflects no factual finding but rather a policy declaration by the court. It involves a determination that freedom of speech is of much greater importance than good government.

If, as the court reasons, libel judgments tend to discourage the exercise of the right of free speech—and this, of course, is the assumption which lies at the root of the doctrine of *New York Times*—then the corollary must be true, that the prospect of exposing oneself to libel, with no remedy to reestablish one's good name, discourages honorable persons from seeking governmental office. Who would undertake public service except one who had nothing to lose? one may ask. Or at least one may ask it as easily as one may ask whether any publisher would freely criticize public officials if he knew they might recover damages if he

carelessly defamed them. For I know of no empirical study upon either of these propositions; and the courts, insofar as I have been able to determine, have cited none. My own observation is that the writers in Time magazine continue to speak out with the same boldness and impish verbiage which they displayed prior to *Time, Inc. v. Firestone, supra,* and its $100,000 verdict. I doubt that even the $500,000 verdict rendered against the New York Times would have so intimidated the publishers of that venerable organ as to cause them to cease to publish "all the news that's fit to print." Nevertheless, I do consider that verdict so unwarranted that the United States Supreme Court would have been justified in setting it aside upon the same reasoning that it changed the rule of law with respect to liability—that is, that the verdict was so excessive as to constitute an unconstitutional burden on the exercise of the right of free speech and press.

It appears that the communications industry has grown to its present enormous size and influence in spite of the inhibitions of libel verdicts. I do not know that "debate" has been more robust or the dissemination of information more unrestrained since *New York Times,* although gossip does appear to be flourishing. Whether the quality of persons seeking public office has been adversely affected is also an open question, although complaint is heard of the dearth of "good" people willing to serve in public office.

Since both of these questions rest in the realm of speculation, neither affords a very sound basis for fashioning a rule of law. It behooves the court to get on with its duty of dispensing justice. Justice, as we have generally conceived it, dictates that one who has suffered harm through the careless act of another should be afforded compensation. It seems to me that if the courts exercise more supervision over verdicts in defamation cases, being careful to see that they reflect the evidence rather than prejudice or speculation, this end can be achieved without undue frustration of freedom of speech and of the press. This is certainly the belief which the United States Supreme Court has

expressed in its recent opinions in *Gertz* and *Firestone,* at least with respect to claims by persons who are neither public officials nor public figures.

The opinion of the majority in this case permits the jury to impose liability upon one who, though employed by the county, exercised no responsibility for or control over the governmental affairs of the county and whose position was not one which invited public scrutiny, entirely apart from the scrutiny engendered by the published charges. To my mind, this is an unwarranted extension of the doctrine of *New York Times.*

There are before the court a number of assignments of error, which the majority has not found it necessary to discuss. The conclusion must be that it has found them to be without merit, since the case is remanded solely for the purpose of taking evidence on the question of malice. I have given serious consideration to those assignments of error and am in agreement with the majority that they do not warrant a granting of a new trial.

WRIGHT, C.J., and HAMILTON and HICKS, JJ., concur with ROSELLINI, J.