[No. 20167-8-III. Division Three. January 16, 2003.]

ROBERT EUBANKS, ET AL., *Appellants*, v. NORTH CASCADES BROADCASTING, ET AL., *Respondents*.

114

*James McPhee* (of *Crumb & Munding, P.S.*), for appellants.

*Richard B. Price*, for respondents.

BROWN, C.J. — North Cascades Broadcasting (North Cascades) broadcast a radio report about the activities of Robert Eubanks in connection with a county remodeling project. Mr. Eubanks filed a defamation action against North Cascades. The trial court, reasoning Mr. Eubanks was a public official or public figure who had failed to raise

a genuine issue of material fact as to whether North Cascades acted with actual malice, dismissed Mr. Eubanks' claim in summary judgment. Mr. Eubanks appeals. We affirm.

## FACTS

The following facts are undisputed. In July 1999, radio stations owned by North Cascades broadcast the following story several times:

> For several weeks now North Cascades broadcasting news has been researching a story regarding the Okanogan county Capital Improvements department activities. This story was initiated in response to several inquiries from listeners and others within Okanogan County Government.

> Now NCBI news has received word that an internal review of the department and the conduct of its Director, Bob Eubanks prepared by Christine Hartwig has led to what some have called a scathing report to the County Commissioners. Hartwig also prepared the review of Okanogan County Mental Health service. The Capital improvements department was formed to provide the structure and personnel needed for oversite [sic] of remodeling improvements to county buildings, primarily the Virginia Grainger School.

> The concerns illuminated in the report focus on hiring practices that have not following [sic] existing county policies regarding advertising and postings of open positions, preferential treatment in hiring given to relatives of Commissioners and other county employees, poor or non-existent accounting of expenses, personal use of property, and the aggressive and sometimes threatening behavior of Director Eubanks.

> North Cascades Broadcasting has also been told by several sources that asbestos removal in the Virginia Grainger building was not handled correctly. Several have claimed that asbestos was removed by a crew of county trustees and supervised by Eubanks who is not certified or licensed for asbestos removal. State law requires asbestos to be removed by properly trained and equipped personnel who are state licensed and certified. Asbestos can only [sic] disposed in state authorized landfills. For safety reasons the law is very specific regarding

the removal, handling and transport of asbestos. Estimates for asbestos removal prepared by Okanogan Schools placed the cost at about $20,000 to $30,000. The asbestos has now been removed and the county has paid a total of $2,697.30 for that removal. NCBI news talked with the [sic] Crown Delta Environmental, Inc., the company responsible [sic] actual removal. We asked how much asbestos was removed and where it was disposed of. The company representative, Kurt Baker claimed that the person responsible for the job was no longer with the company and that company records regarding the job were not available for review because they were stored in a, now closed, office. In short, we were put off.

The question needs to be asked and answered, how much asbestos was removed and by whom, what landfill did it go into. The answers are important. Improper handling of asbestos can carry large fines and places county employees and others in harms way.

Eubanks was also responsible for the burning of old county records at the Virginia Grainger School several weeks ago. This burning resulted in the county being fined by the Department of Ecology.

County employees and Department heads have raised concerns to the County Commissioners regarding these and other issues in regard to the Capital Improvements Department and Bob Eubanks. To date the Commissioners have usually minimized or put off the concerns, in particular Commissioner Ed Thiele, whose son works under Eubanks in the Capital Improvements department. In response to the issues raised, Eubanks is usually defended by referring to all the money he [sic] his efforts are saving the county.

Clerk's Papers (CP) at 8.

In August 1999, Mr. Eubanks filed a defamation claim against North Cascades, alleging generally the broadcast contained "false statements." CP at 4. In November 2000, North Cascades filed a motion for summary judgment. In March 2001, the trial court issued a memorandum opinion granting the summary judgment motion. It reasoned Mr. Eubanks was a public official or a public figure, and had not produced evidence North Cascades acted with actual mal-

ice. A written order dismissing Mr. Eubanks' complaint followed in April 2001. Mr. Eubanks appealed.

## ANALYSIS

The issue is whether the trial court erred in deciding no material facts remained in dispute, granting North Cascades' summary judgment motion, and concluding Mr. Eubanks was a public official who failed to make the necessary showing of actual malice on North Cascades' part.

██ In reviewing a summary judgment, the appellate court engages in the same inquiry as the trial court. *Huff v. Budbill*, 141 Wn.2d 1, 7, 1 P.3d 1138 (2000). Summary judgment is appropriate when no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. CR 56(c); *Huff*, 141 Wn.2d at 7. "A material fact is one upon which the outcome of the litigation depends." *Dien Tran v. State Farm Fire & Cas. Co.*, 136 Wn.2d 214, 223, 961 P.2d 358 (1998) (citing *Ruff v. King County*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995)). The appellate court reviews all facts and reasonable inferences in the light most favorable to the nonmoving party. *Huff*, 141 Wn.2d at 7. And de novo review applies to issues of law. *Id.*

██ Mr. Eubanks filed a defamation claim against North Cascades. To establish a prima facie defamation claim, the plaintiff must show (1) that the defendant's statement was false, (2) that the statement was unprivileged, (3) that the defendant was at fault, and (4) that the statement proximately caused damages. *Caruso v. Local Union No. 690*, 107 Wn.2d 524, 529, 730 P.2d 1299 (1987); *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981). To defeat a defense summary judgment motion in a defamation action, the plaintiff must raise a genuine issue of material fact as to all four elements of the claim. *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989); *Mark*, 96 Wn.2d at 486. "The prima facie case must consist of

specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." *LaMon*, 112 Wn.2d at 197 (citing *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 170, 736 P.2d 249 (1987); *Guntheroth v. Rodaway*, 107 Wn.2d 170, 175, 727 P.2d 982 (1986)).

 Although the parties focus on the privilege and fault elements, we first discuss the falsity element because the defamation plaintiff must initially prove the offensive statement is "provably false." *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590, 943 P.2d 350 (1997). One way a statement could be provably false is when "it falsely describes the act, condition or event that comprises its subject matter." *Id.* at 591. The statement could be provably false in whole or in part. *Id.* at 592-93. Mr. Eubanks, in his briefing, alleges falsity generally without identifying the statements in the story that are allegedly false.

At most, Mr. Eubanks' briefing infers three parts of the story were particularly offensive. First, the story stated with respect to an internal county review:

> The concerns illuminated in the report focus on hiring practices that have not followed existing county policies regarding advertising and postings of open positions, preferential treatment in hiring given to relatives of Commissioners and other county employees, poor or non-existent accounting expenses, personal use of county property, and the aggressive and sometimes threatening behavior of Director Eubanks.

CP at 159.

Second, the story stated several sources had "claimed that asbestos was removed by a crew of county trustees and supervised by Eubanks who is not certified or licensed for asbestos removal." CP at 159. Third, the story stated, "Eubanks was also responsible for the burning of old county records at the Virginia Grainger School several weeks ago." CP at 159.

When asked at oral argument to elaborate on falsity, Mr. Eubanks was vague. He mentioned the accounting, hiring,

use of county property, and anger management allegations, which is consistent with his briefing.

Mr. Eubanks further claimed at argument the report falsely alleged he had authority to fire people. But the challenged news story contains no such allegation.

Mr. Eubanks also placed importance on alleged unauthorized faxes by county personnel. But the radio report does not mention such faxes. And there is no evidence in the record connecting the alleged faxes to the challenged report. The issue of unauthorized faxes is irrelevant as to the alleged falsity of the challenged report.

■ We further note Mr. Eubanks admitted in a deposition the existence of the underlying controversy. In other words, Mr. Eubanks admitted people made the accusations reported in the story. Mr. Eubanks grounds his defamation claim on the alleged falsity of those allegations reported in the story without articulating a recognized theory for North Cascades' liability for reporting on the controversy. In any event, we assume, without deciding, Mr. Eubanks grounds his theory on republication of defamatory matter. *See generally* RESTATEMENT (SECOND) OF TORTS, §§ 568A, 577, 577A, 578 (1977).

A review of the entire record reflects a great deal of controversy over Mr. Eubanks' conduct in connection with the remodeling project. For the sake of brevity, we assume, without deciding, Mr. Eubanks has raised genuine issues of material fact as to whether the radio story contained statements casting Mr. Eubanks in a defamatory light. The determinative issues relate to privilege and fault.

■ The primary bone of contention is whether Mr. Eubanks was a private individual or a public official at the relevant time. If Mr. Eubanks was a public official, the broadcast is constitutionally protected unless Mr. Eubanks can prove by clear and convincing evidence North Cascades broadcast the story with actual malice. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Tribune Publ'g Co.*, 108 Wn.2d at 169-70;

*Clawson v. Longview Publ'g Co.*, 91 Wn.2d 408, 413, 589 P.2d 1223 (1979). By contrast, unless certain privileges apply, a private individual need merely show by a preponderance of the evidence the defendant negligently published defamatory matter. *Bender v. City of Seattle*, 99 Wn.2d 582, 599, 664 P.2d 492 (1983); *Taskett v. KING Broad. Co.*, 86 Wn.2d 439, 445, 546 P.2d 81 (1976); *Moe v. Wise*, 97 Wn. App. 950, 957, 989 P.2d 1148 (1999), *review denied*, 140 Wn.2d 1025 (2000); *Haueter v. Cowles Publ'g Co.*, 61 Wn. App. 572, 582-84, 811 P.2d 231 (1991). Here, the trial court reasoned Mr. Eubanks was a public official or public figure.

■ Whether the plaintiff is a public official or a public figure is a question of law. *Clawson*, 91 Wn.2d at 413; *see also* RESTATEMENT (SECOND), *supra*, § 580A cmt. c at 217. We apply a constitutional standard in defining public official. *Clawson*, 91 Wn.2d at 413-14. The *Clawson* court reasoned the most important factor distinguishing public and private plaintiffs is the assumption of the risk of greater public scrutiny of public life. *Id.* at 416. Of secondary importance is the public plaintiff's ease of access to the press. *Id.* at 414-15. The actual malice standard applies to any aspect of a public official's life reflecting upon his or her fitness for the position. *Id.* at 416-17.

The scope of the public official restriction on defamation actions varies in accordance with the power and importance of the concerned official. *See id.* at 417. When the official wields general power and exercises broad discretion, the scope of the public official restriction is broad. *Id.* The restriction narrows when the official is less powerful; "exposure is limited to matters more closely connected to actual job performance." *Id.* Accordingly, we consider two variables when assessing the scope of the restriction: "(1) the importance of the position held, and (2) the nexus between that position and the allegedly defamatory information—specifically, how closely the defamatory material bears upon fitness for office." *Id.* We now apply these principles to Mr. Eubanks' situation.

■ Mr. Eubanks characterizes himself generally as nothing more than a contractor without authority to do much of anything. The record establishes otherwise. According to his official letterhead, Mr. Eubanks was variously "Project Manager" or "Project Director" for the county's office of capital improvements. Suppl. CP at 57, 60, 71. He reported directly to the county commissioners during much of the relevant time. Mr. Eubanks received a salary from the county and requested a raise. In his brief, Mr. Eubanks described his title at one point as "Director of Facilities." Appellant's Br. at 3.

In his own words, Mr. Eubanks' primary responsibility was to "oversee" the remodeling of the Virginia Grainger School for use as county offices. Suppl. CP at 57. He claimed he could save the county $400,000 on the project. And he demanded full control of the project. Mr. Eubanks supervised remodeling the county courthouse for better disability access.

Mr. Eubanks also asserted in a letter to the county commissioners that he "monitored" both the capital improvement department and the maintenance department. Suppl. CP at 60. He stated also that he had "developed a proposed plan" intended to save the county money. Suppl. CP at 61.

In another letter, Mr. Eubanks asked the county's administrative coordinator to look into insurance coverage for jail trustees. Mr. Eubanks also explained his job entailed keeping track of every item his department spent on the project. Accordingly, Mr. Eubanks asked for authority to hire a part-time bookkeeper. Mr. Eubanks explained he made certain requests in order "to perform my duties as a manager to the best of my ability." Suppl. CP at 63. In a letter to another county employee, Mr. Eubanks explained he was responsible for submitting payroll time cards and other documentation related to project expenses.

Mr. Eubanks also complained to another employee about a misunderstanding regarding the project. Mr. Eubanks explained he was engaged in negotiations with an architec-

tural firm. In Mr. Eubanks' own words, "As we discussed in the executive session, it was decided that only one person would be handling the negotiations and construction renovation for the project and that it would be myself." Suppl. CP at 73. Mr. Eubanks also explained, "I will personally take a trip to Tacoma next week and go over there [sic] participation line item by line item on Virginia Grainger." Suppl. CP at 73. And Mr. Eubanks admonished, "It is extremely important that I be included in all Commissioner and Department meetings regarding anything pertaining to the Capital Improvement Projects." Suppl. CP at 73.

Moreover, Mr. Eubanks made the following admission in a deposition: "My duties were to oversee construction projects, negotiate construction projects, to estimate construction projects, to actually manage the project and to bring it in under cost." Suppl. CP at 31. In connection with the allegation of improperly burned records, Mr. Eubanks contended his "crew" of workers did not intervene when another department allegedly torched the records. Suppl. CP at 45. And Mr. Eubanks admitted hiring his father-in-law and the son of a county commissioner to work on the project on an "emergency" basis. CP at 50-54.

The record clearly contradicts Mr. Eubanks' attempt to downplay the importance of his public role in Okanogan County. In sum, Mr. Eubanks was a public official for purposes of this action; therefore, the radio story was constitutionally protected so long as it fell within the permissible scope and was not broadcast with actual malice. *See Clawson*, 91 Wn.2d at 417-19.

As for permissible scope, every material word of the radio report related in some way to Mr. Eubanks' area of supervision. In other words, there was a close nexus between the subject matter of the story and Mr. Eubanks' job performance and fitness for the position. *See Clawson*, 91 Wn.2d at 417; *Martonik v. Durkan*, 23 Wn. App. 47, 52-54, 596 P.2d 1054 (1979). Consequently, the story fell within the scope of constitutional protection. The next inquiry is actual malice.

■■ ■■ Actual malice in the defamation context means the publisher knew the offensive matter was false or acted in reckless disregard as to the truth or falsity of the matter. *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 775, 776 P.2d 98 (1989). To establish actual malice, the defamation plaintiff must prove the defendant was plagued with serious doubts as to the truth of the offending statement. *Id.* The defendant's failure to investigate or mistakes he or she made in investigating the offensive story will not establish recklessness absent evidence of knowledge or reckless disregard. *Id.* at 777.

■■ ■■ The clear and convincing standard of proof applies at the summary judgment stage as it does at trial. *Tribune Publ'g Co.*, 108 Wn.2d at 170. Accordingly, "the plaintiff must offer evidence sufficient to permit a reasonable trier of fact to find clear and convincing proof" of actual malice. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Under this higher standard of proof, a mere scintilla of evidence, evidence that is merely colorable, or evidence lacking significant probative value will not deter a defendant's summary judgment motion. *Tribune Publ'g Co.*, 108 Wn.2d at 170.

For purposes of discussion, we assume, without deciding, the story was false in some respects notwithstanding Mr. Eubanks' failure to address falsity in his briefing. Moreover, we find Mr. Eubanks' arguments pertaining to alleged malice on the part of certain county employees unpersuasive. The issue is whether North Cascades acted with actual malice.

The uncontroverted evidence shows North Cascades received initial information about the controversy in early 1999 and made follow-up calls. But it did not run the story at that time because of inconsistencies between sources. Later in the year, North Cascades received more information from additional sources and decided to make more contacts. It made more than a dozen phone calls to various

sources to check the validity of the story before broadcasting it.

The foregoing record, interpreted in a light favorable to Mr. Eubanks, shows North Cascades made an effort to investigate and validate the story before broadcasting it. Because no evidence shows North Cascades either knew the allegations to be false or acted in reckless disregard, Mr. Eubanks cannot establish a genuine issue of material fact as to actual malice.

In sum, Mr. Eubanks was a public official, and he failed to establish the fault element of defamation sufficiently to survive summary judgment. Consequently, the trial court did not err.

Affirmed.

SWEENEY and SCHULTHEIS, JJ., concur.