[No. 27197-8-III.   Division Three.   January 12, 2010.]

PATRICIA VALDEZ-ZONTEK, *Respondent*, v. EASTMONT SCHOOL DISTRICT, *Appellant*.

148

*Gerald J. Moberg* and *Jennifer D. Homer* (of *Jerry J. Moberg & Associates*); and *Michael E. McFarland Jr.*, for appellant.

*Robin W. Phillips* and *Mario A. Bianchi* (of *Lasher Holzapfel Sperry & Ebberson*), for respondent.

¶1 BROWN, J. — On appeal, the Eastmont School District (District) challenges the defamation verdict favoring its former employee, Patricia Valdez-Zontek. The District contends (1) no evidence shows a provably false statement; (2) the court erred in ruling Ms. Valdez-Zontek was not a public

figure; (3) certain instructions were erroneous, confusing, and misleading; (4) the court erred in not granting attorney fees, costs, and liquidated damages under the anti-SLAPP (strategic lawsuits against public participation) statute, RCW 4.24.510; and (5) the award to Ms. Valdez-Zontek to alleviate the adverse tax consequences of her recovered legal fees was improper. On cross appeal, Ms. Valdez-Zontek contends the court erred under RCW 4.56.110 by applying too low an interest rate on the amounts attributable to her statutory discrimination claims. We affirm in all respects.

## ■ FACTS[1]

¶2  Ms. Valdez-Zontek, a person of Hispanic descent, was hired by the District in 1999 as its special programs director. She oversaw administration of several state and federally funded school programs. She also worked closely with the Office of Superintendent of Public Instruction (OSPI) and the Title 1 LAP (learning assistance program) office. Her school-year employment contracts did not include summer work paid under a supplemental contract. In 2001, two critical events occurred: (1) the District referred Ms. Valdez-Zontek's summer time sheets to the Washington State Auditor's Office for suspected hours not worked and (2) a rumor circulated that Ms. Valdez-Zontek, who is married, was having a romantic affair with the District's school superintendent, Joel Thaut, her immediate supervisor until early 2002.

¶3  In early August 2001, Ms. Valdez-Zontek submitted a summer time sheet. The District's payroll officer, Sandy Poole, referred it to Assistant Superintendent Beverly Jagla. Ms. Jagla conferred with Assistant Superintendent Mike Brophy. Ms. Valdez-Zontek explained to Mr. Brophy

---

[1] Ms. Valdez-Zontek sued the District and an assistant superintendant (Mike Brophy). After summary dismissals, the District was the sole defendant at trial. The facts are stated in light of principles that we do not reweigh the evidence, draw our own inferences, or substitute our judgment for the jury. *E.g.*, *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 108, 864 P.2d 937 (1994).

she had an agreement with Mr. Thaut that she could work extra hours over the summer. Ms. Jagla and Mr. Brophy discussed the time sheet with Mr. Thaut, who said he would take care of the matter. Two weeks later, the District's business manager, Jean Gunderson, reported to Ms. Jagla that she had a second time sheet for Ms. Valdez-Zontek, signed by Mr. Thaut, containing the same number of hours.

¶4 The new time sheet did not satisfy Ms. Jagla. According to Mr. Thaut, Ms. Jagla suggested the motive for his approving Ms. Valdez-Zontek's time sheets was the alleged affair; Mr. Thaut denied it. Ms. Jagla then investigated Ms. Valdez-Zontek's 2000 summer work activities for improper pay under two employment contracts. By September, Ms. Valdez-Zontek complained to Mr. Thaut that she had not received her summer 2001 pay. He directed Ms. Poole to make an interim payment of $1,500. Ms. Jagla and Mr. Brophy disputed the payment.

¶5 Ms. Jagla and Mr. Brophy initiated an executive school board session to address allegations that Mr. Thaut's refusal to resolve Ms. Valdez-Zontek's time sheet disparities was leading to misuse of public funds. As part of her explanation to the board, Ms. Jagla submitted an inaccurate modified time sheet purporting to bear Ms. Valdez-Zontek's signature in two places. Ms. Jagla actually created the document herself and traced Ms. Valdez-Zontek's signature. Ms. Valdez-Zontek was not allowed to explain her position to the board.

¶6 In November 2001, District Board President Roy Miller submitted a formal written audit request for all district personnel to the Washington State Auditor's Office, specifying that the District learned that a misuse of state monies may have occurred relating to (1) inappropriate and/or inaccurate submission of time sheets by certain district personnel for claimed supplemental work performed during summer 2001 and (2) duplicate billing of the District for alleged supplemental work performed by certain district personnel during summer 2000.

¶7 Later, Mr. Miller told the Washington State audit manager, Scott Renick, to limit the investigation to Ms. Valdez-Zontek and her secretary. Ms. Jagla then supplied the limited documents to Mr. Renick, including the modified time sheet she created but with the word "sample" added. Report of Proceedings (RP) at 2389. According to Mr. Renick, on November 27, 2001, Ms. Jagla asked him to investigate the alleged affair. He told her that was not within the scope of his audit or authority to investigate.

¶8 Mr. Renick ultimately cleared Ms. Valdez-Zontek of wrongdoing that resulted in monetary benefit to her. Trial evidence revealed the District's long-standing practice of allowing additional hours to be filled in on days not worked and allowing summer work without signed supplemental contracts, or after-the-fact approval of such work. Time sheets for administrators Chris Hall and Dennis Gibson not submitted for audit in 2001 later proved to be miscoded and resulted in funds being misappropriated.

¶9 After Mr. Thaut denied the alleged affair, he learned from board member Andy Gale that Ms. Jagla had told the board that the pair was having an affair and that it was upsetting the administrative team. Mr. Thaut told Mr. Gale the rumor was not true. Board President Roy Miller began investigating. Mr. Miller spoke with school principals Dennis Gibson, Bob Busk, and Beverly Baugh about what he termed a possible "inappropriate relationship" that could present a conflict of interest in the spending of public funds. RP at 2214. Based upon those discussions, Mr. Miller found no evidence of inappropriate conduct.

¶10 The jury heard evidence that Ms. Jagla told Mr. Busk that the board would likely ask for Mr. Thaut's resignation because of rumors he was having an affair with Ms. Valdez-Zontek. Mr. Busk met with elementary school principals Marsha Reynolds, Kay Fusson, and Beverly Baugh and discussed the alleged affair with them. Ms. Baugh said Mr. Busk discussed it as "a sexual relationship or affair that was going on." RP at 549. Other witnesses related having spread the affair rumor or having heard it.

For example, Ms. Jagla alleged to Mr. Renick that Mr. Thaut and Ms. Valdez-Zontek were having an affair. Ms. Jagla ultimately admitted at trial, however, that she did not recall anyone spreading the rumor to her and that she had absolutely no basis to say that the alleged affair was true.

¶11 Mr. Thaut and Ms. Valdez-Zontek each denied any affair to individuals who broached the subject in 2001 and 2002, and repeated their denials at trial.

¶12 The evidence showed the board took no steps to stop the rumor. It ultimately spread throughout the District and local community, as well as among school personnel in the Wenatchee, Moses Lake, Yakima, Spokane, Quincy and Seattle school districts, and to OSPI. Partly due to controversy between Ms. Valdez-Zontek and the District's administration, the District demoted Ms. Valdez-Zontek to a lesser paying nonadministrative position in the spring of 2002. She instead resigned and took a position in Yakima.

¶13 The case went to the jury on claims of disparate treatment discrimination based upon race or sex in the terms and conditions of employment and by constructive discharge; retaliation by transfer to a nonadministrative position and by constructive discharge; outrage (in the manner the affair rumor was investigated); negligent infliction of emotional distress (as to affair rumor investigation); defamation (as to affair rumor investigation); and invasion of privacy (limited to false light claim).

¶14 The jury found the District liable for each claim of disparate treatment discrimination and retaliation, negligent infliction of emotional distress, and defamation for the manner in which it investigated the romantic affair rumor. The jury found the District committed defamation per se. The jury awarded Ms. Valdez-Zontek $35,000 in economic damages, $75,000 in noneconomic damages, and $75,000 in presumed damages. On appeal, the District challenges solely the defamation verdict.

## ANALYSIS

### A. Provably False Statement Establishing Defamation

¶15 The issue is whether substantial evidence shows any District official made a provably false statement regarding the alleged romantic affair between Ms. Valdez-Zontek and Mr. Thaut.

■ ¶16 A defamation plaintiff must establish four elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005); *Bender v. City of Seattle*, 99 Wn.2d 582, 599, 664 P.2d 492 (1983). The degree of fault necessary to make out a prima facie case of defamation depends on if the plaintiff is a private individual or a public figure or official. *Bender*, 99 Wn.2d at 599. The negligence standard of fault applies if the plaintiff is a private individual; negligence is established by a preponderance of the evidence. *Id.* A plaintiff who is a public figure or official must prove " 'actual malice,' " i.e., knowledge of falsity or reckless disregard of the truth or falsity, by clear and convincing evidence. *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)); *Moe v. Wise*, 97 Wn. App. 950, 957, 989 P.2d 1148 (1999).

■■ ¶17 To establish the falsity element of defamation, the plaintiff must show the offensive statement was "provably false." *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590-91, 943 P.2d 350 (1997). " '[E]xpressions of opinion are protected by the First Amendment' " and " 'are not actionable.' " *Robel v. Roundup Corp.*, 148 Wn.2d 35, 55, 59 P.3d 611 (2002) (quoting *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 39, 723 P.2d 1195 (1986)). But a statement meets the provably false test to the extent it expresses or implies provable facts, regardless of whether the statement is, in form, a statement of fact or a statement of opinion. *Schmalenberg*, 87 Wn. App. at 590-91; *see Henderson v. Pennwalt Corp.*, 41 Wn. App. 547, 557, 704

P.2d 1256 (1985) (citing *Benjamin v. Cowles Publ'g Co.*, 37 Wn. App. 916, 684 P.2d 739 (1984); RESTATEMENT (SECOND) OF TORTS § 566 (1976)). One way a statement could be provably false is when "it falsely describes the act, condition or event that comprises its subject matter." *Schmalenberg*, 87 Wn. App. at 591. If a direct statement of facts would be defamatory, then a statement of an opinion implying the existence of those false facts supports a defamation action. *Henderson*, 41 Wn. App. at 557. Such is the case when ordinary persons hearing the statements would not perceive them to be "pure" expressions of opinion. *Id.* at 557-58.

■ ■ ¶18 We do not reweigh conflicting evidence or otherwise disturb the jury's determinations as to persuasiveness of the evidence or credibility of witnesses. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 108, 864 P.2d 937 (1994). The District argues its officials only referred to an "inappropriate relationship" during a legitimate investigation and never specifically alleged a sexual affair. But, abundant substantial evidence supports the jury's contrary conclusion.

¶19 After Mr. Thaut denied the affair to Ms. Jagla in the fall of 2001, he learned from board member Andy Gale that Ms. Jagla had told the board about the alleged affair and that it was upsetting the administrative team. Mr. Miller spoke with school principals about what Mr. Miller termed a possible "inappropriate relationship." RP at 2216. The jury heard that Ms. Jagla told Mr. Busk the board would likely ask for Mr. Thaut's resignation because of the rumored affair. Mr. Busk met with elementary school principals and discussed the alleged affair with them. Ms. Baugh said Mr. Busk discussed it as "a sexual relationship or affair that was going on." RP at 549. Mr. Gale also met with Ms. Baugh to discuss whether she had heard the rumors of the alleged sexual relationship. Mr. Gale discussed the rumor with school principal John Westerman, who said the word "affair" was used and he understood it to mean a sexual relationship. RP at 227-28. Ms. Jagla alleged to the auditor, Mr. Renick, on November 27, 2001, that Mr. Thaut and Ms.

Valdez-Zontek were having an affair, which he took to mean a sexual relationship. Mr. Renick testified that Ms. Jagla did not use the words "inappropriate relationship." RP at 2432.

¶20 Mr. Thaut and Ms. Valdez-Zontek consistently denied any affair before trial and at trial. No evidence established the existence of an affair. Considering this record, the rumor alleging the existence of the affair was provably false. In the end, the jury believed Mr. Thaut and Ms. Valdez-Zontek.

## B. Private Individual Determination

¶21 The issue is whether the court erred in ruling Ms. Valdez-Zontek was a private individual, not a public official, for purposes of her defamation claim.

¶22 Whether the plaintiff is a public figure for purposes of a defamation claim is a question of law for the court to decide. *Clawson v. Longview Publ'g Co.*, 91 Wn.2d 408, 413, 589 P.2d 1223 (1979). "To be considered a public figure, courts usually require the plaintiff to voluntarily seek to influence the resolution of public issues." *Camer*, 45 Wn. App. at 42) (citing *Bender*, 99 Wn.2d at 600). In *Clawson*, the court stated the most important factor distinguishing public and private plaintiffs is the assumption of the risk of greater public scrutiny of public life. *Clawson*, 91 Wn.2d at 416. Of secondary importance is the public plaintiff's ease of access to the press. *Id.* at 414-15. The actual malice standard applies to any aspect of a public official's life reflecting upon his or her fitness for the position. *Id.* at 416-17. The *Clawson* court explained:

> With officials wielding general power and exercising broad discretion, the scope of that standard is necessarily comprehensive, encompassing virtually all of the public official's life. However, with persons such as respondent, the "public official" standard fails to sweep so broadly; exposure is limited to matters more closely connected to actual job performance. In essence, we find two pertinent variables: (1) the importance of

the position held, and (2) the nexus between that position and the allegedly defamatory information—specifically, how closely the defamatory material bears upon fitness for office.

*Id.* at 417 (citations omitted); *see Eubanks v. N. Cascades Broad.*, 115 Wn. App. 113, 122-24, 61 P.3d 368 (2003).

¶23 This 4,000 page record does not show where the court decided this issue. Before trial, the District proposed instructions consistent with Ms. Valdez-Zontek being a public official. At the very outset of trial the District's counsel said:

I don't need a change in the instruction, but I do ask the Court to keep an open mind on the defamation claim as to whether or not Ms. Zontek is a public figure, because it changes the standard, and we can deal with that in the instructions.

RP at 17. The court responded, "And that's why I took it out of the preliminary instruction. Okay. That is the malice requirement. . . . To preserve the issue." RP at 17-18. The District did not object to giving or taking exception for failing to give the defamation instructions. The court instructed the jury consistent with Ms. Valdez-Zontek being a private individual in the defamation elements instruction. Without deciding, we assume the public figure issue is preserved.

¶24 Relying on *Corbally*, the District contends Ms. Valdez-Zontek must be considered a public figure because of her special programs director position. *Corbally v. Kennewick Sch. Dist.*, 94 Wn. App. 736, 973 P.2d 1074 (1999). We disagree. In *Corbally*, a middle school art teacher sued a school district for defamation after a newspaper published articles about the District's investigation of complaints about sexually explicit drawings and reports of sexual harassment. Mr. Corbally was dismissed from his employment but was reinstated after arbitration. The local newspaper then reported statements by district officials including comments on their disappointment in the ruling and reluctance to reinstate Mr. Corbally to a teaching position. The court granted summary judgment for the District. This

court affirmed, partly holding, "Mr. Corbally's conduct was that of a public official because it involved the manner in which he performed his teaching duties pursuant to public contract." *Id.* at 741.

¶25 Likewise, Ms. Valdez-Zontek is a public official *to the extent that her conduct involved the manner in which she performed her job duties* pursuant to public contract. She had a level of public visibility and accountability for school programs and public fund expenditures, including the manner in which she submitted time sheets. She would certainly be a public official for a defamation claim pertaining to the District's accusations that she falsified her time sheets and thereby unlawfully received public money. But her defamation claim pertained only to the alleged affair—not the alleged time sheet improprieties or any other aspect of her job duties with the District.

¶26 The dispositive question under the *Clawson* test is whether any nexus exists between Ms. Valdez-Zontek's public employment duty to submit proper time sheets and the defamatory statements alleging the affair. The unsubstantiated rumor of a sexual affair has no bearing on the manner in which she performed her public duties. It was not alleged Ms. Valdez-Zontek engaged in a sexual affair with Mr. Thaut to get him to approve false time sheets. Thus, no close nexus exists between the affair rumors and Ms. Valdez-Zontek's job performance. The affair statements therefore do not fall within the permissible scope of her public role. *See Clawson*, 91 Wn.2d at 417; *Eubanks*, 115 Wn. App. at 122-24. The court did not err in considering her a private figure for defamation purposes. Our conclusion obviates the need to address the District's additional argument that the defamation elements instruction, number 18, is erroneous because it did not include an actual malice requirement.

## C. Common Interest Privilege

¶27 The issue is whether the statements made by district officials about the alleged affair are nonetheless protected by a common interest privilege.

¶28 When a plaintiff has established a prima facie case of defamation, the defendant can assert either an absolute or a qualified privilege to defend against liability for defamatory statements. *See Bender*, 99 Wn.2d at 600. When the facts are not in dispute as to the circumstances of the alleged defamatory communication, the determination whether a privilege applies is a matter of law for the court to decide. *Moe*, 97 Wn. App. at 957; *Parry v. George H. Brown & Assocs.*, 46 Wn. App. 193, 196, 730 P.2d 95 (1986).

¶29 The District asserted a common interest privilege. The privilege applies when the declarant and the recipient have a common interest in the "subject matter of the communication." *Moe*, 97 Wn. App. at 957-58. This privilege generally applies to organizations, partnerships, and associations and "arises when parties need to speak freely and openly about subjects of common organizational or pecuniary interest." *Id.* at 958, 959; *see also Momah v. Bharti*, 144 Wn. App. 731, 747-48, 182 P.3d 455 (2008). Here, the court apparently determined the existence of the common interest privilege was an issue of fact because it instructed the jury that the District had the burden of proving by a preponderance of the evidence that any communication was privileged.

¶30 If the defendant establishes that the privilege applies, the privilege may be lost if the plaintiff can show it was abused. *Bender*, 99 Wn.2d at 600 (citing *Gem Trading Co. v. Cudahy Corp.*, 92 Wn.2d 956, 960, 603 P.2d 828 (1979)). Even a private individual plaintiff must then show abuse of the privilege under the heightened clear and convincing standard. *Bender*, 99 Wn.2d at 601; *Moe*, 97 Wn. App. at 963.

¶31 Although we cannot tell from the verdict how the jury considered the common interest privilege, the District produced substantial evidence, if believed by the jury, that no one associated with the District perpetuated any rumor of a sexual affair. Thus, the jury theoretically could have found the District had some common interest privilege in its discussions of the relationship. Therefore, we assume a limited common interest privilege for our analysis.

¶32 The question becomes whether substantial clear and convincing evidence shows the District abused, and therefore lost, any common interest privilege. Again, it is not our role to reweigh conflicting evidence.

¶33 *Moe* summarizes the ways in which abuse of privilege may be shown:

> The defendant abuses the qualified privilege if he or she (1) knows the matter to be false or acts in reckless disregard as to its truth or falsity of the statement, (2) does not act for the purpose of protecting the interest that is the reason for the existence of the privilege, (3) knowingly publishes the matter to a person to whom its publication is not otherwise privileged, (4) does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given, or (5) publishes unprivileged as well as privileged matter.

*Moe*, 97 Wn. App. at 963 (citations omitted).

¶34 Here, instruction 19 exactly reflected the five *Moe* criteria. In view of *Moe*, an additional argument raised by the District for the first time on appeal that this instruction misstated the law is without merit. *See also* 16A DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 19.18, at 25 (3d ed. 2006).

¶35 The burden of proof instruction (instruction 20) further directed that if the jury found that a communication was privileged, then Ms. Valdez-Zontek had the burden of proving abuse of the privilege by the heightened clear and convincing standard. And to satisfy this burden, she must prove the defendant knew the communication was false, or acted with reckless disregard for the truth or falsity of the

communication. *Id.* § 19.13, at 20. "Reckless disregard" means a high degree of awareness of probable falsity, or the publisher of the communication entertained serious doubts as to its truth. *Id.* § 19.13, at 20. Instruction 20 also comported with Washington law. *See Herron v. KING Broad. Co.*, 109 Wn.2d 514, 523, 746 P.2d 295 (1987); *Story v. Shelter Bay Co.*, 52 Wn. App. 334, 341-42, 760 P.2d 368 (1988).

¶36 The District argues for the first time on appeal that instructions 19 and 20, when read together, lessened Ms. Valdez-Zontek's burden of proof. The District theorizes the jury could have found abuse of privilege as to criteria 2, 3, 4, or 5 in instruction 19 without meeting the reckless disregard standard required in instruction 20. But no one objected to the giving of instructions 19 and 20. They are the law of the case. *Delgado Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 917, 32 P.3d 250 (2001). Moreover, instruction 20 clearly set forth the heightened standards for proving abuse of privilege.

¶37 Focusing on abuse of privilege, it is true that in the context of the time sheet investigation and possible misuse of public funds, the board had good cause to investigate if an inappropriate relationship had resulted in a conflict of interest. But no evidence shows anyone had any proof of a sexual affair. The District incorrectly argues that preexisting affair rumors dated back to at least 2000. No testimony shows anyone spread sexual affair rumors before the 2001 time sheet issue arose.

¶38 After Mr. Thaut denied the affair to Ms. Jagla in the fall of 2001, the facts show abundant instances of rumor perpetuation by district personnel. In the end, Ms. Jagla admitted at trial that she did not recall anyone spreading the rumor to her and that she had absolutely no basis to say that the alleged affair was true. Meanwhile, district officials took no measures to stop the affair rumor.

¶39 Given this record, substantial clear and convincing evidence exists from which the jury could have found that district officials knowingly spread the affair rumor well beyond the scope of any common interest privilege for

investigating a possible conflict of interest, and that they did so with a high degree of awareness that the rumor was probably false.

## D. Instructions

¶40 Failure to object to jury instructions waives objection on appeal. *Peterson v. Littlejohn*, 56 Wn. App. 1, 11, 781 P.2d 1329 (1989) (citing *Estate of Ryder v. Kelly-Springfield Tire Co.*, 91 Wn.2d 111, 587 P.2d 160 (1978)). "Instructions to which no exceptions are taken become the law of the case." *Delgado Guijosa*, 144 Wn.2d at 917.

¶41 Here, the District did not object to any of the defamation instructions, nor did it take exception to the court's refusal to give any of its proposed defamation instructions. The instructions given are the law of the case.

¶42 Even so, instructions 18, 19, and 20 are, as discussed, error free. The District contends manifest constitutional error permits our consideration of instruction 22 (defamation per se) for the first time on appeal. RAP 2.5(a)(3).

¶43 Instruction 22 states:

> Generally, a plaintiff may recover only the actual damages caused by defamation. However, plaintiff is not required to prove actual damages if a communication constitutes "defamation *per se*." A defamatory communication is defamation *per se* if it injures the plaintiff in her profession or creates the imputation of unchastity to her, and, further, the defendant knew the communication was false or acted with reckless disregard for the truth or falsity of the communication.
>
> If you find that defendant made a communication that was defamation *per se*, then plaintiff may recover presumed damages, reflecting non-economic loss such as harm to reputation and emotional distress.

Clerk's Papers (CP) at 196.

¶44 The District first argues the instruction fails to make clear that in order to establish defamation per se, Ms.

Valdez-Zontek was required to show a provably false statement. Instead, the instruction refers to the undefined term "defamatory communication." CP at 196. To be legally accurate, the instruction must make clear that evidence of a provably false statement is needed.

¶45 The argument lacks merit. The jury would not have considered defamation per se unless it had already found a prima facie case of defamation (a defamatory communication) under instruction 18. To make that determination, the jury had to have already found a provably false statement. No further reference to a provably false statement was needed in instruction 22.

¶46 The District next argues instruction 22 erroneously omits a crucial element of defamation per se: that the plaintiff must prove actual malice by clear and convincing evidence. This argument also fails.

¶47 The instruction contains the equivalent of the actual malice requirement (reckless disregard for truth or falsity) but does not repeat the clear and convincing standard. Once the jury got to the point of considering defamation per se, it had already found lack of privilege, presumably by clear and convincing evidence due to abuse of privilege. In any event, the common interest privilege burden of proof instruction (instruction 20) informed the jury that reckless disregard must be proved by clear and convincing evidence. The jury therefore must have been mindful of that burden when considering the defamation per se instruction. The standard did not have to be repeated. Thus, no manifest error is shown. Accordingly, without manifest error no further review is warranted. In sum, all the challenged defamation instructions are the law of the case.

E. RCW 4.24.510 Immunity

¶48 The issue is whether the District is immune from liability under RCW 4.24.510 for Ms. Jagla's statement to the auditor (Mr. Renick) that Ms. Valdez-Zontek was having an affair with Mr. Thaut.

¶49 RCW 4.24.510 (the anti-SLAPP statute) partly provides:

A person who communicates a complaint or information to any branch or agency of federal, state, or local government . . . is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization. A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall receive statutory damages of ten thousand dollars. Statutory damages may be denied if the court finds that the complaint or information was communicated in bad faith.

¶50 The statute "grants immunity from civil liability for those who complain to their government regarding issues of public interest or social significance." *Skimming v. Boxer*, 119 Wn. App. 748, 758, 82 P.3d 707 (2004). The purpose of the statute is to protect citizens who provide information to government agencies by providing a defense for retaliatory lawsuits. A citizen prevailing on the defense is entitled to attorney fees and a statutory penalty. *Eugster v. City of Spokane*, 139 Wn. App. 21, 26-27, 156 P.3d 912 (2007). The statute protects solely communications of reasonable concern to the agency. *Gontmakher v. City of Bellevue*, 120 Wn. App. 365, 372, 85 P.3d 926 (2004). Thus, the statute does not provide immunity for other acts that are not based upon the communications. *Id.*

¶51 The District's arguments are without merit. First, as discussed above, Ms. Jagla and other district officials broadcast nonprivileged and provably false statements about the alleged affair to numerous individuals. Substantial evidence supports a finding of defamation liability, with or without Ms. Jagla's statement to Mr. Renick.

¶52 Next, instruction 12 states:

A Washington statute, RCW 4.24.510, provides that a party, including a government entity[,]

"who communicates a complaint or information to any branch or agency of federal, state, or local government is

immune from civil liability for claims based upon the communication to the agency regarding any matter reasonably of concern to that agency."

Therefore, in determining whether or not Patricia Valdez-Zontek has proved her disparate treatment discrimination claim, you may not consider the fact of Eastmont School District's request for an audit by the Washington State Auditor, in and of itself, or the content of its communications to the Auditor, as evidence supporting that claim.

On the other hand, if you find that plaintiff's sex and/or race was a substantial factor in defendant's decision to request the audit, then you may consider it, along with all other evidence bearing on the question, in deciding the *disparate treatment discrimination claim*.

CP at 186 (emphasis added).

¶53 Thus, the purpose of the instruction was to convey to the jury that the fact of a request for an audit or the content of communications to the auditor could not be considered for purposes of the disparate treatment discrimination claim. The instruction does not pertain to the defamation claim.

¶54 Moreover, Mr. Renick testified that the alleged sexual affair disclosed to him by Ms. Jagla was beyond the scope of his duties in auditing Ms. Valdez-Zontek's time sheets. Thus, certainly, no common interest privilege would include Mr. Renick, and Ms. Jagla's communication to him was properly admitted evidence of a provably false defamatory statement.

### F. Attorney Fees and Costs under RCW 4.24.510

¶55 The issue is whether the court erred in denying the District's request for attorney fees, costs, and liquidated damages under RCW 4.24.510, for what it considers to be a successful defense against Ms. Valdez-Zontek's disparate treatment discrimination claim.

¶56 Posttrial, the District requested an award of costs, attorney fees, and a liquidated damages penalty, alleging

Ms. Valdez-Zontek's lawsuit violated RCW 4.24.510. The District unsuccessfully contended it had proved her lawsuit was in retaliation for the District reporting her time sheets to the state auditor and that the statute protected the District's actions.

¶57 The point of the first three paragraphs of instruction 12 was to clarify for the jury that the District was not liable in discrimination for the mere fact of the time sheet referral or the communications made with the referral. In its argument, the District omits from its analysis the final paragraph of instruction 12. Consistent with this instruction, counsel for Ms. Valdez-Zontek made clear in closing argument that the time sheets were not the issue, but that the case "is about why she was singled out." RP at 2661.

¶58 Contrary to the District's argument, Ms. Valdez-Zontek did not allege disparate treatment discrimination based merely on the referral of her time sheets to the auditor. Her complaint alleged that she was targeted by the District because of her gender and national origin and that "to forward" that goal her time sheets were challenged and referred to the auditor. CP at 2A. This is consistent with the "substantial factor" standard stated in the jury instruction.

¶59 The District argues Ms. Valdez-Zontek's pleadings and supporting declaration at the summary judgment stage establish the discrimination claim was based upon the time sheet referral. But again, the cited passages indicate that Ms. Valdez-Zontek was broadly alleging her gender and race motivated her mistreatment by district officials. For example, she alleged anti-Hispanic opposition to the dual language program she worked to implement in the summer of 2001, yet the District embarked on a "witch hunt" (time sheet referral) to keep her from being paid for those hours she worked with Mr. Thaut's approval.

¶60 Substantial evidence and reasonable inferences supported the theory allowed under paragraph four of the instruction. The District could be liable for discrimination if Ms. Valdez-Zontek's sex or race was a substantial factor in the decision to refer solely her time sheets to the auditor,

and not those of other non-Hispanic or male District employees whose summer timekeeping methods were either similar to Ms. Valdez-Zontek's or raised other payment concerns.

¶61 In sum, the District did not partially prevail on Ms. Valdez-Zontek's disparate treatment discrimination claim merely because the court gave an instruction that essentially clarified the scope of her claim. The trial court correctly rejected the District's claim for an attorney fee, cost, and damage award under RCW 4.24.510. The suggested issue of bad faith is then not relevant.

## G. Adverse Tax Consequences

¶62 The issue is whether the court procedurally erred in awarding Ms. Valdez-Zontek additional monies to alleviate the adverse tax consequences of her attorney fees recovered.

¶63 The Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, "allows an offset for '*additional* federal income tax consequences' incurred by an employment discrimination plaintiff." *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 534, 151 P.3d 976 (2007) (quoting *Blaney v. Int'l Ass'n of Machinists & Aerospace Workers*, 151 Wn.2d 203, 215-16, 87 P.3d 757 (2004)). An additional award for offsetting tax consequences is improper for noneconomic damages but is proper for economic awards and attorney fees. *Id.* at 532, 535-36, 538.

¶64 When Ms. Valdez-Zontek moved for an attorney fee and cost award on March 24, 2008, she specifically raised the adverse tax consequence issue, citing the *Blaney* and *Chuong Van Pham* cases. She concluded, "To the extent Plaintiff will suffer adverse tax consequences as a result of an attorney's fee award in this case, the court may properly augment the attorney's fee award to ameliorate those adverse tax consequences." CP at 221. Since the amount of the attorney fee award was still in question, the motion contained no supporting documentation for an adverse tax consequences award.

¶65 The District filed its memorandum opposing the fee and cost request on April 17, 2008, contesting the amount of fees and costs without mention of the adverse tax consequences issue. Ms. Valdez-Zontek filed her reply memorandum on April 18, 2008 with the declaration of Certified Public Accountant Michael Crouch:

> Based upon my general view of tax returns for the years 2002-2007, Ms. Valdez-Zontek has suffered a tax detriment of approximately $9,600 based in an estimated average tax rate differential (deduction benefit vs. tax liability upon legal fee recovery) of 6% applicable to $160,000 of legal fees paid during this period of years.

CP at 471. Mr. Crouch's declaration was served on the District by facsimile at 2:55 p.m. on April 18—a Friday.

¶66 The attorney fee hearing was held the next business day—on Monday, April 21—with counsel for both parties present. That day, the court issued a letter ruling awarding fees and costs to Ms. Valdez-Zontek but reducing the allowable hourly attorney billing rate. The court made an overall 20 percent downward adjustment to the requested attorney fees and costs to account for nonsuccessful and non-fee-award claims. Regarding costs, the court stated, "Plaintiff is correct that the award is not limited to generally-recoverable litigation costs. *Further, the parties haven't argued that any particular cost claimed was excessive or unnecessary.*" CP at 499 (emphasis added). The court then requested Ms. Valdez-Zontek's counsel to "do the math" relating to the adjustments and to circulate an appropriate order granting fees and costs to plaintiff. *Id.*

¶67 On May 9, Ms. Valdez-Zontek's counsel filed a supplemental declaration in support of the award of fees and costs. Included was a detail of the costs, which subtotaled $31,952.36. Included for the first time were the invoices for Mr. Crouch's accounting fees. Addition of the $9,600.00 adjustment for tax consequences and $1,387.50 for Mr. Crouch's fees made the total cost bill $42,939.86. The amount was then reduced to 80 percent, or $34,351.89.

¶68 On June 2, the District's counsel filed a memorandum challenging the fee and cost calculations on several bases, including the $9,600.00 for adverse tax consequences and $1,387.50 in accounting fees. Counsel contended:

> These "costs" were not approved by the court and would not be allowable as costs in any event. The defendant has never had an opportunity to review or rebut any claim of adverse tax consequences. The court would have to have a hearing and make factual determinations regarding the tax consequences issue that are far beyond the scope of determining fees and costs.

CP at 513-14.

¶69 On June 10, the court awarded Ms. Valdez-Zontek's requested attorney fees of $182,090.39 and costs of $34,351.89 with a specific finding that all of the requested costs were allowable pursuant to RCW 49.60.030, which incorporates the fee and cost award provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k), and chapter 4.84 RCW. The court further found the cost calculations and award were "appropriate." CP at 573.

¶70 Given the timeline and the court's comment regarding costs in the initial letter ruling, it appears the District raised no challenge to the claim for $9,600 in adverse tax consequences at the April 21 hearing, despite the late Friday afternoon notice. The District has not supplied a hearing transcript from which to make a contrary conclusion. Even after the May 9 receipt of the supplemental declaration and Crouch invoices, the District apparently did not seek leave of the court to retain a rebuttal expert. Instead, the District waited until June 2 to raise any challenge to the award of costs for adverse tax consequences and associated accounting fees.

¶71 Considering all, we conclude the District fails to show it was not afforded sufficient notice and opportunity to raise challenges to the award of adverse tax consequences, costs, or associated accounting fees.

## H. Cross Appeal

¶72 The trial court rejected Ms. Valdez-Zontek's request for a 12 percent judgment interest rate for her recovery on the WLAD claim. Instead, under RCW 4.56.110(3), the court applied a 3.69 percent rate to the entire judgment, which was comprised of $35,000 in economic damages (applicable to WLAD claims); $75,000 (for WLAD and/or common law negligent infliction of emotional distress, and/or defamation); and $75,000 presumed damages (defamation per se).

¶73 The issue is whether the court erred in applying a judgment interest rate of 3.69 percent under RCW 4.56-.110(3) to recover for the WLAD claims, as opposed to a 12.00 percent rate under RCW 4.56.110(4).

¶74 RCW 4.56.110 provides in pertinent part:

(3) Judgments founded on the tortious conduct of individuals or other entities, whether acting in their personal or representative capacities, shall bear interest from the date of entry at two percentage points above the equivalent coupon issue yield, as published by the board of governors of the federal reserve system, of the average bill rate for twenty-six week treasury bills as determined at the first bill market auction conducted during the calendar month immediately preceding the date of entry. . . .

(4) Except as provided under subsections (1), (2), and (3) of this section, judgments shall bear interest from the date of entry at the maximum rate permitted under RCW 19.52.020 on the date of entry thereof.

¶75 This appears to be an issue of first impression in Washington, as no case is cited or found that specifically discusses the correct judgment interest rate for recovery on WLAD claims.

¶76 The $75,000 in presumed damages for defamation sounds in tort. The $35,000 in economic damages stems

from the WLAD claim. But the structure of the special verdict form makes it impossible to determine to what extent the $75,000 in noneconomic damages is for violation of the WLAD and what portion is attributable to the common law torts of negligent infliction of emotional distress and/or defamation.

¶77 Based upon *Blair v. Washington State University*, 108 Wn.2d 558, 740 P.2d 1379 (1987), all of the WLAD damages sound in tort. In *Blair*, the suit for sex discrimination was brought against a state entity under chapter 49.60 RCW. The court held the preclaim notice requirement of RCW 4.92.110 for filing an action "arising out of tortious conduct" applies to WLAD discrimination actions. The court reasoned that it has characterized a discrimination action as a tort. *Id.* at 576 (citing *Anderson v. Pantages Theatre Co.*, 114 Wash. 24, 194 P. 813 (1921)). Therefore, textual analysis supported application of the RCW 4.92.110 "tortious conduct" to the WLAD action. *Id.* at 576. The court explained the legislature did not intend to exempt discrimination actions from the requirements of RCW 4.92.110. *Id.*

¶78 As argued by Ms. Valdez-Zontek, the courts have recognized a distinction between recovery for statutory discrimination claims and common law torts, including those for discrimination. *E.g.*, *Dean v. Mun. of Metro. Seattle-Metro*, 104 Wn.2d 627, 640, 708 P.2d 393 (1985) (statutory damages under chapter 49.60 RCW distinguishable from common law recovery for emotional distress based upon intentional discrimination or intentional tort); *Wahl v. Dash Point Family Dental Clinic, Inc.*, 144 Wn. App. 34, 181 P.3d 864 (2008) (claim under chapter 49.60 RCW distinguished from common law wrongful discharge claim); *Jenkins v. Palmer*, 116 Wn. App. 671, 674, 677, 66 P.3d 1119 (2003) (plaintiff raised WLAD claims and common law sexual discrimination and retaliation claims); *Milligan v. Thompson*, 90 Wn. App. 586, 590-91, 953 P.2d 112 (1998) (statutory WLAD/Title VII claims distinguished from common law torts of outrage, defamation, and infliction of emotional distress).

¶79 As *Blair* recognized, however, the legislative intent is to consider WLAD discrimination actions as arising from tortious conduct. The court in *Hintz v. Kitsap County*, 92 Wn. App. 10, 13-14, 960 P.2d 946 (1998), reasoned likewise when considering the preclaim requirements of RCW 4.96.020(4) for commencing an action under the WLAD against any local government entity for damages "arising out of tortious conduct."

¶80 Ms. Valdez-Zontek's argument that WLAD claims are not tort claims because attorney fees are not awarded for common law tort claims, but are awarded in WLAD claims, is not persuasive. The legislature exercised its prerogative to authorize attorney fees for statutory (WLAD) claims it considers to be tort-like, i.e., arising out of tortious conduct. It then follows that judgments based upon such claims are "founded on the tortious conduct." RCW 4.56.110(3).

¶81 Since the portion of WLAD's definition of unfair practices in employment based upon sex and national origin (RCW 49.60.180) is similar to the federal counterpart in the Civil Rights Act of 1964 (Title VII) (as amended), which forbids discrimination based on an employee's "race, color, religion, sex, or national origin" (42 U.S.C. § 2000e-2(a)(1)), we may look to federal cases for instruction when construing the parameters of chapter 49.60 RCW. *See Glasgow v. Ga.-Pac. Corp.*, 103 Wn.2d 401, 406 n.2, 693 P.2d 708 (1985); *Henningsen v. Worldcom, Inc.*, 102 Wn. App. 828, 842, 9 P.3d 948 (2000).

¶82 Federal courts apply a variable postjudgment interest rate determined by 28 U.S.C. § 1961(a) in discrimination cases under Title VII of the Civil Rights Act of 1964. The statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" in an amount that is to be "calculated from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28

176

U.S.C. § 1961(a); *see Equal Emp't Opportunity Comm'n v. Guardian Pools, Inc.*, 828 F.2d 1507, 1512-13 (11th Cir. 1987); *Wirtz v. Kan. Farm Bureau Servs., Inc.*, 274 F. Supp. 2d 1215, 1224 (D. Kan. 2003); *see also Dye v. Bellsouth Telecomms., Inc.*, 462 F. Supp. 2d 845, 858 (W.D. Tenn. 2006). The cases illustrate a variable interest rate applies to postjudgment interest in Title VII cases in much the same way that RCW 4.56.110(3) applies a variable or floating rate to tort claims.

¶83 Ms. Valdez-Zontek's cited case, *Salvi v. Suffolk County Sheriff's Dep't*, 67 Mass. App. Ct. 596, 609-10, 855 N.E.2d 777 (2006), is distinguishable. There, the court upheld a 12 percent *prejudgment* interest rate for plaintiff's back pay and emotional distress claims. *Postjudgment* interest was not at issue in *Salvi*. No state or federal disparate treatment discrimination case has been cited or found in which postjudgment interest was calculated under anything but a variable or floating rate statute. In sum, Ms. Valdez-Zontek makes no persuasive argument for a 12 percent interest rate.

¶84 Affirmed.

KULIK, C.J., and SWEENEY, J., concur.